**FIRST DIVISION
BARNES, P. J.,
GOBEIL and PIPKIN, JJ.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules**

*DEADLINES ARE NO LONGER TOLLED IN THIS COURT. ALL FILINGS MUST BE SUBMITTED WITHIN THE TIMES SET BY OUR COURT RULES.*

**November 2, 2020**

# In the Court of Appeals of Georgia

A20A1366, A20A1438. CALLICOTT v. SCOTT et al.; and vice versa

GOBEIL, Judge.

Terilyn Callicott, a minority shareholder in Homeowners Mortgage of America, Inc. ("HOMA"), filed a direct action against HOMA's other shareholders, Paul Scott and Kris Williams, as well as several corporate entities controlled by Scott and Williams[1] (these entities, together with Scott and Williams, are collectively referred to as the "defendants"). In her complaint, as amended, Callicott asserted claims for

---

[1] The entities named in the suit are: FFG Management, LLC, Kennetic Productions, Inc., FFG Lender Services, LLC, Foundation Financial Properties, LLC ("FFP"), Foundation Financial Group, LLC ("FFG"), MKP Wyoming Property, LLC, and Foundation Insurance Services, LLC ("FIS") (these entities are collectively referred to as the "FFG Entity defendants").

inter alia violations of Georgia's Racketeer Influenced and Corrupt Organizations ("RICO") Act, breach of fiduciary duties, and unjust enrichment.

In Case No. A20A1438, the defendants appeal the trial court's denial of their motion for summary judgment, asserting that Callicott was required to bring a derivative action because she did not suffer a special injury that would allow her to bring a direct action, and HOMA had a judgment creditor in need of protection. In Case No. A20A1366, Callicott argues that the trial court erred by granting partial summary judgment to the defendants based on the affirmative defense of ratification. She also argues the trial court erred by granting summary judgment to FFG Management and FIS on Callicott's RICO and conspiracy claims.[2] For the reasons explained more fully below, we agree with the defendants and reverse in Case No. A20A1438, and we dismiss Callicott's appeal in Case No. A20A1366 as moot.

---

[2] After the trial court issued its summary judgment order on November 19, 2018, Callicott timely appealed in Case No. A19A1833. The defendants cross-appealed in Case No. A19A1834. In March 2019, the defendants filed motions to dismiss the appeal for Callicott's failure to cause the record to be timely transmitted to this Court. However, the trial court did not rule upon the motion prior to the transmittal of the record to this Court. Accordingly, we remanded the appeals for resolution of the defendants' motion to dismiss Callicott's appeal. The trial court denied the motion, and Callicott's appeal was re-docketed as Case No. A20A1366. The defendants' cross-appeal was re-docketed as Case No. A20A1438.

On appeal, we review the trial court's summary judgment ruling de novo and "construe the evidence and all reasonable inferences therefrom in the light most favorable to . . . the nonmovant." *Hindmon v. Virgil's Food Mart, Inc.*, 252 Ga. App. 732, 732 (556 SE2d 135) (2001).

*Factual Background*

Callicott founded HOMA, a mortgage lending company that was certified as a direct-endorsed lender by the U. S. Department of Housing and Urban Development ("HUD"), in 1998. Scott and Williams owned and operated FFG, a company they founded in 2003 that was licensed as a correspondent lender in 20 states. In 2008, the parties agreed to merge HOMA with FFG, with HOMA remaining as the surviving entity based on its status as a "Full Eagle" license holder.[3] Via the execution of several agreements, HOMA purchased FFG's assets, and Callicott, Scott, and Williams each had a one-third ownership interest in HOMA. As part of the transaction, Callicott, Scott, and Williams executed an agreement that entitled Callicott to compensation in the form of distributions from HOMA for a period of

---

[3] Licensure at "Full Eagle" status by the federal government enables mortgage companies to originate and close Federal Housing Administration loans.

3

two years after execution of the agreement. Under the terms of the agreement, Callicott was to draw distributions equal to that of Scott and Williams until 2010.

In 2009, Callicott held the position of President of HOMA, Scott was CEO, and Williams was HOMA's COO. In October 2009, via a corporate resolution, Callicott resigned her position as a member of HOMA's board of directors and agreed to "hold no position with HOMA as a Board Member, as an Officer, or as a Manager in the Company," but she continued to own a one-third interest in the company.

After the expiration of the two-year agreement, effective January 1, 2011, Scott and Williams founded FIS as an affiliate of HOMA to offer homeowners insurance to HOMA customers who were considering refinancing their mortgages. Scott and Williams opened FFG Management in September 2012, to provide administrative services to HOMA, including human resources, accounting, and marketing. According to the defendants, these companies created substantial benefit to HOMA and increased its profits. Prior to establishing these outside companies, Scott and Williams conferred with third-party accountants and specialists, and these advisors approved the corporate structure and rates that FFG Management would charge HOMA. Callicott claimed these entities charged HOMA exorbitant fees for their

4

services, and that Scott and Williams used these companies to misappropriate funds from HOMA.

HOMA provided Callicott with monthly income statements, both before and after the creation of FFG Management. The amount HOMA paid to FFG Management for its services was identified in the monthly financial statements, which Callicott admitted to receiving. Specifically, beginning in 2012, HOMA's monthly financial statements showed nearly $500,000 in "Management Person[n]el" expenditures, an operating expense that had not appeared on monthly financial statements prior to FFG Management's inception. Callicott also participated in monthly conference calls with upper management at which the management fees were discussed.

HOMA ceased operating in July 2014. In 2016, the Georgia Secretary of State administratively dissolved HOMA "for failure to file its annual registration and/or failure to maintain a registered agent or registered office in this state." According to Callicott, HOMA's eventual dissolution was a result of Scott's and Williams's mismanagement and misappropriation of corporate assets. Conversely, Scott and Williams attributed HOMA's decline to Callicott's prior management practices, including originating "risky" mortgages, and rising interest rates, which resulted in decreased demand for mortgage refinancing.

After HOMA's dissolution, OTR, an Ohio General Partnership Acting as the Duly Authorized Nominee of the Board of the State Teachers Retirement System of Ohio ("OTR")[4] filed a complaint in 2014 against HOMA and Callicott in the State Court of Fulton County. The suit involved unpaid rent under a lease agreement for office space in Cobb County between OTR and HOMA, for which Callicott allegedly had executed a personal guaranty. However, Callicott disputed the authenticity of the guaranty. Specifically, Callicott maintained that her signature had been forged and "whoever executed [ ] Callicott's signature on [the lease] documents did so unilaterally and deceptively without [ ] Callicott's knowledge or authorization."[5] In support of this assertion, Callicott retained the services of a handwriting expert who opined that Callicott did not sign the lease documents. As a result, in October 2014, OTR dismissed Callicott from the action without prejudice.

In March 2015, the state court entered a default judgment against HOMA in the amount of $611,800.85 in unpaid rent, plus attorney fees and court costs in the amount of $61,505.59, with post-judgment interest accruing at the rate provided by

_____

[4] OTR is a holding company for real estate owned by the State Teacher's Retirement System of Ohio's pension fund.

[5] According to the defendants, Tanya Mauro, HOMA's CFO, executed the relevant lease documents with Callicott's express consent and authorization.

law. In its order, the state court noted that OTR had dismissed Callicott from the action, but clarified that the court did not "intend this judgment to be in addition to any sums recovered from defendant Callicott, and *any* amounts recovered from either [HOMA or Callicott], whether by consent agreement or under this order, shall be applied to reduce the liability of each defendant, jointly." The amount owed to OTR remains outstanding.

*Procedural Background*

Callicott filed the instant suit against the defendants in 2016, as amended in 2017, alleging that "Scott and Williams siphoned off at least $12,100,000.00 from HOMA to themselves and a byzantine network of companies they owned or controlled." Specifically, Callicott asserted claims for (1) breach of fiduciary duties (against Scott and Williams); (2) violations of subsection (a) of Georgia's RICO Act (against all defendants); (3) violations of subsection (b) of Georgia's RICO Act (against all defendants); (4) violations of the subsection (c) of Georgia's RICO Act (against all defendants); (5) unjust enrichment (against MKP Wyoming, Kennetic Productions, FFG, FFG Management, FFP, and FFG Lender Services); (6) punitive and exemplary damages (against all defendants); and (7) attorney fees and expenses of litigation (against all defendants). Callicott brought the action as a direct, rather

than a derivative action, asserting that, as the sole minority shareholder, she suffered a unique injury as a result of the defendants' actions.

Underpinning Callicott's complaint is the allegation that the defendants "unlawfully took and misappropriated certain funds belonging to HOMA and [Callicott] with the intention of depriving HOMA and [Callicott] of same." As to her claim for breach of fiduciary duties, for example, Callicott alleged that Scott and Williams breached their fiduciary duties to HOMA by inter alia (1) entering into contracts with the FFG Entity defendants "on commercially unreasonable terms while contracting under a conflict-of-interest with respect to those entities"; (2) devoting their loyalty and care to the FFG Entity defendants during times they were obligated to be performing services for HOMA; (3) usurping corporate opportunities by siphoning fees away from HOMA to FIS; and (4) transferring millions of dollars in additional funds belonging to HOMA to themselves and third parties. Callicott further alleged that the FFG Entity defendants were unjustly enriched by retaining funds paid by HOMA without corresponding value received. Among her specific allegations, Callicott claimed that between 2012 and 2013, Scott and Williams caused HOMA to pay $8,361,756 in management fees to FFG Management, but "HOMA did not receive $8,361,756.00 worth of services from FFG Management during this time."

8

Callicott further alleged that the defendants "wired funds belonging to HOMA to themselves and/or entities or accounts with which they were associated with no corresponding benefit to HOMA." According to Callicott, as a result of the defendants' actions, she suffered a separate and distinct injury because HOMA was her primary source of income.

Following discovery, the defendants filed numerous motions for summary judgment, both individually and jointly.[6] As relevant here, in their first motion for summary judgment, the defendants argued that Callicott's direct claims were

---

[6] In their other joint motions for summary judgment, the defendants argued that: (1) the two-year agreement barred Callicott's claims; and (2) Callicott ratified and acquiesced in the conduct underlying her complaint. On November 10, 2018, the trial court issued an order disposing of eight pending motions for summary judgment. With respect to the two-year agreement, the trial court denied the defendants' motion for summary judgment, finding that "there are disputed material facts as to the effect of the [two-year agreement] on the claims pending in this litigation." Turning to the defendants' affirmative defense of ratification, the trial court found that the undisputed evidence showed that Callicott ratified all conduct by HOMA and its board of directors during 2012 and 2013, based on the monthly financial statements and two shareholder consents that purported to ratify, approve, and confirm all actions taken in fiscal years 2012 and 2013. Accordingly, the court granted summary judgment in favor of the defendants for any allegations arising during 2012 and 2013. With respect to Callicott's claim for unjust enrichment against FFG Management, the court denied summary judgment, but noted that "[a]ny recovery for this claim should properly be awarded to HOMA and not directly to [Callicott]." In the same order, the trial court granted summary judgment to FFG, MKP Wyoming Property, FFG Lender Services, and Kennetic Productions, noting that Callicott did not oppose their respective motions for summary judgment.

derivative in nature, and she thus had no standing to proceed individually to recover for injuries suffered by HOMA.

While the summary judgment motions were pending, Callicott offered "to take an assignment of [OTR's] judgment, pursue a recovery against Williams and Scott, and pay OTR on a first dollar basis out of [Callicott's] recovery, up to an amount to be negotiated." OTR rejected Callicott's offer, noting that Callicott did not offer money "up front as a good faith deposit." Additionally, OTR reasoned that it could attempt to satisfy its judgment directly from HOMA if the company returned to profitability, or, in the alternative, from Callicott based on the existence of the personal guaranty.

After a hearing on the summary judgment motion involving whether Callicott was permitted to pursue a direct action,[7] the trial court denied the defendants' motion, ruling that the reasons ordinarily requiring a derivative suit were not present in this case. Specifically, the trial court found that HOMA's landlord creditor, OTR, was not in need of protection because (1) Callicott provided a personal guaranty for HOMA's financial obligation to the creditor, and (2) Callicott offered to take assignment of the

---

[7] On August 31, 2018, the trial court heard argument pertaining to whether Callicott's claims should have been in a derivative action. The court heard argument on the remaining summary judgment motions on October 26, 2018.

creditor's judgment against HOMA in exchange for any recovery up to the amount of OTR's judgment should Callicott prevail in the underlying suit. The defendants appealed this order in Case No. A20A1438. In Case. No. A20A1366, Callicott appealed the trial court's order on the defendants' individual and joint motions for summary judgment. See footnote 6, supra.

*A20A1438*

1. The defendants argue that Callicott was required to bring her claims in a derivative action on behalf of HOMA, rather than in a direct action. In a shareholder derivative action, the shareholder sues on behalf of the corporation for the harm done to it, and any damages recovered by the shareholder are paid to the corporation. See *Phoenix Airline Svcs. v. Metro Airlines, Inc.*, 260 Ga. 584, 586 (1) (397 SE2d 699) (1990). See also OCGA § 14-2-740 et seq. Because such an action seeks to redress a wrong sustained by the corporation rather than the individual plaintiff, "[i]t has long been recognized . . . that the corporation is a proper and indispensable party." *Kilburn v. Young*, 244 Ga. App. 743, 744 (1) (536 SE2d 769) (2000) (citation and punctuation omitted). In contrast, in a direct shareholder action, the shareholder sues on her own behalf for injuries done to her in her individual capacity by corporate fiduciaries, and

11

any damages recovered go to the shareholder rather than the corporation. See *Phoenix Airline Svcs.*, 260 Ga. at 586 (1).

(a) A shareholder may bring a direct rather than a derivation action, "seeking recovery on behalf of the shareholder individually[ ] if the suit alleges a special injury separate and distinct from that suffered by other shareholders, or alleges a wrong involving a shareholder contractual right existing apart from any right of the corporation." *Rosenfeld v. Rosenfeld*, 286 Ga. App. 61, 64 (2) (648 SE2d 399) (2007) (citations and punctuation omitted). See *Thomas v. Dickson*, 250 Ga. 772, 774 (301 SE2d 49) (1983). "The determination of whether a claim is derivative or direct is made by looking to what the pleader alleged. It is the nature of the wrong alleged and not the pleader's designation or stated intention that controls the court's decision." *Southwest Health & Wellness, LLC v. Work*, 282 Ga. App. 619, 624 (2) (a) (639 SE2d 570) (2006) (citations and punctuation omitted). See *Phoenix Airline Svcs.*, 260 Ga. at 585-586 (1).

Here, Callicott alleged in her complaint that the defendants had misappropriated corporate assets and disguised these misappropriations on corporate

documents to hide the nature of their activites.[8] But the general rule in Georgia is that allegations of misappropriation of corporate assets and breach of fiduciary duty can only be pursued in a shareholder derivative suit brought on behalf of the corporation, because the injury is to the corporation and its shareholders collectively. See *Phoenix Airline Svcs.*, 260 Ga. at 585-586 (1); *Southwest Health & Wellness*, 282 Ga. App. at 625 (2) (b); *Parks v. Multimedia Technologies, Inc.*, 239 Ga. App. 282, 287 (2) (520 SE2d 517) (1999).

Citing *Barnett v. Fullard*, 306 Ga. App. 148, 154 (4) (701 SE2d 608) (2010), Callicott argues she was entitled to bring a direct action because the defendants' conduct in siphoning money away from HOMA amounted to a failure "to make distributions in proportion to [Callicott's] shares[,]" thereby causing her special injury. However, Callicott did not raise this claim in her complaint, as amended, nor did she further amend her complaint to include her contention regarding insufficient distributions. Instead, in her response to the defendants' motion for summary judgment, Callicott alleged for the first time that "Scott and Williams disguised their preferential distributions as payments for services or assets for HOMA, and falsely

---

[8] It is undisputed that Callicott did not allege a wrong involving a shareholder contractual right that existed separate from any right of HOMA.

13

reported them as such on financial documents[,] . . . constitut[ing] direct harm to Ms. Callicott by cutting her out of distributions."

This new claim

made for the first time in response to the motion for summary judgment does not satisfy even the liberal requirements of the Georgia Civil Practice Act for notice pleading because the complaint was not amended to add a new claim of [improper distributions] against [the defendants], nor were [the defendants] given reasonable notice of the claim or opportunity to frame a responsive pleading to the claim.

*R. W. Holdco, Inc. v. Johnson*, 267 Ga. App. 859, 866 (2) (b) (601 SE2d 177) (2004) (citation and punctuation omitted). Therefore, Callicott's claims for improper distributions are not properly before us. Id. Indeed, her complaint is "devoid of any allegation of a separate and distinct injury to [Callicott]" that would make the general rule for these types of claims inapplicable. *Phoenix Airline Svcs.*, 260 Ga. at 586 (1). See *Southwest Health & Wellness*, 282 Ga. App. at 625-626 (2) (b); *Paul and Suzie Schutt Irrevocable Family Trust v. NAC Holding, Inc.*, 283 Ga. App. 834, 835 (1) (642 SE2d 872) (2007). Accordingly, we agree with the defendants that Callicott failed to allege a special injury that would give her standing to pursue her claims directly.

14

(b) Nevertheless, in the context of a closely held corporation, the general rule requiring a shareholder to bring a derivative rather than direct action when seeking redress for injury to the corporation may not always apply. See *Southwest Health & Wellness*, 282 Ga. App. at 626 (2) (c) (even if a shareholder fails to allege a special injury, she may nevertheless bring a direct action if the corporation is closely held and "the circumstances show that the reasons for the general rule requiring a derivative suit do not apply") (citation and emphasis omitted). See also *Thomas*, 250 Ga. at 774.

> [T]he reasons for requiring derivative suits in the ordinary corporate context are (1) to prevent multiple suits by shareholders; (2) to protect corporate creditors by ensuring that the recovery goes to the corporation; (3) to protect the interest of all the shareholders by ensuring that the recovery goes to the corporation, rather than allowing recovery by one or a few shareholders to the prejudice of others; and (4) to adequately compensate injured shareholders by increasing their share values.

*Southwest Health & Wellness*, 282 Ga. App. at 626 (2) (c) (citation, punctuation, and emphasis omitted). If at least one of these reasons for requiring a derivative suit applies, the plaintiff shareholder cannot maintain a direct action. See id. at 626-627 (2) (c) (holding that plaintiff shareholders must bring derivative action when one of the reasons for requiring derivative action — to prevent multiple lawsuits — applied).

15

As relevant here, HOMA has an outstanding judgment creditor, OTR. The defendants argue that the trial court erred by ruling that the existence of the personal guaranty and Callicott's offer to take assignment of OTR's judgment sufficed to protect OTR's interests. Further, the defendants maintain the trial court erred by fashioning a new standard by weighing the creditor's need for protection. We agree.

As an initial matter, Callicott disputed the validity of the personal guaranty in the Fulton County litigation, and OTR dismissed her from the action without prejudice as a result. The trial court cited this guaranty as one reason that OTR was not in need of protection, but Callicott's prior position in the Fulton County litigation renders this finding questionable. Even if the guaranty was valid and enforceable, had OTR assigned its judgment to Callicott in exchange for a possible payout, its recovery would be dependent upon Callicott's success in the underlying suit. Indeed, if OTR accepted Callicott's offer to take assignment of OTR's judgment, OTR would have no recourse if Callicott abandoned the litigation altogether.[9] Furthermore, had

[9] In her deposition, OTR's attorney recognized that if "[OTR] assign[ed] [the] judgment, [OTR] had the potential of getting nothing and ending up without [its] judgment at the end of the day if there's no recovery by [ ] Callicott." Likewise, OTR's senior asset manager testified that OTR turned down Callicott's proposal due to a lack of "certainty," and because OTR "felt that [it] should have control over . . . the judgment . . . and wait until an opportunity comes down the road" to satisfy the judgment.

16

Callicott pursued this as a derivative action, any recovery would go to HOMA, and OTR would have an opportunity to pursue its judgment against HOMA. These particular facts demonstrate the hazards of weighing a creditor's need for protection. Here, Callicott's direct action could circumvent OTR's rights as a creditor because any recovery would go to Callicott, and not HOMA. Because OTR is a creditor in need of protection, the exception permitting a direct action instead of through a derivative suit cannot be applied in this case. See *Southwest Health & Wellness*, 282 Ga. App. at 627 (2) (c). It follows that Callicott was required to bring her claims in a derivative rather than direct action, and the trial court erred in denying the defendants' motion for summary judgment on this issue. See *Southland Propane, Inc. v. McWhorter*, 312 Ga. App. 812, 817 (1) (720 SE2d 270) (2011) (holding that the plaintiff shareholders could not bring a direct action when one of the reasons for requiring derivative actions applied, which was to protect corporate creditors); see also *Matthews v. Tele-Systems, Inc.*, 240 Ga. App. 871, 873 ( (525 SE2d 413) (1999) ("If the corporation has creditors or other shareholders who would be prejudiced if the misappropriated funds were not returned to the corporation, then a direct action must fail.").

*A20A1366*

17

2. Based on our holding in Division 1, supra, that Callicott was required to pursue her claims in a derivative action, her appeal of the trial court's order granting partial summary judgment to the defendants is dismissed as moot.

*Judgment reversed in Case. No. A20A1438. Appeal dismissed as moot in Case No. A20A1366. Barnes, P. J., and Pipkin, J., concur.*